United States District Court
Southern District of Texas
FILED

APR 23 2014

David J. Bradley, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
MCALLEN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| Plaintiff | § | CRIMINAL NO. M-14-565 |
| | § | |
| v. | § | |
| | § | 18 U.S.C. § 1349 |
| | § | 18 U.S.C. § 1001 |
| NATALIE MARTINEZ, | § | |
| Defendant | § | |

## INFORMATION

THE UNITED STATES ATTORNEY CHARGES:

### COUNT ONE
### CONSPIRACY TO COMMIT HEALTH CARE FRAUD
### (18 U.S.C. § 1349)

#### A. INTRODUCTION

At all times material to this Information:

#### THE MEDICARE PROGRAM

1.  The Medicare program (Medicare) is a federally-funded health care program designed to provide medical care to individuals over age 65 and individuals with disabilities. Medicare is administered by the Centers for Medicare and Medicaid Services (CMS), a federal agency under the U.S. Department of Health and Human

Services (HHS). Medicare is a "health care benefit program" as defined by Title 18, United States Code, Section 24(b).

2. Medicare is divided into multiple Parts: Medicare Part A (hospital insurance) and Medicare Part B (medical insurance). Medicare Part A covers inpatient hospital, inpatient skilled nursing, inpatient hospice, and some home health care services. Medicare Part B covers physician's services and outpatient beneficiary care, including some home health care services.

3. Individuals who qualify for Medicare benefits are commonly referred to as "beneficiaries." Each beneficiary is given a Medicare identification number, referred to as a Health Insurance Claim Number (HICN).

4. Home health care companies, pharmacies, physicians, and other health care providers that provide services to Medicare beneficiaries are referred to as "providers." To participate in Medicare, a provider is required to submit an application in which the provider agrees to comply with all Medicare-related laws and regulations. If Medicare approves a provider's application, Medicare assigns the provider a National Provider Identification (NPI) number. A health care provider with a Medicare NPI number can file claims with Medicare to obtain reimbursement for medically necessary services rendered to beneficiaries.

5. Once Medicare approves a provider's application, the provider is supplied with a current copy of the Medicare Part A and Part B Provider Manuals. In

addition, Medicare provides further guidance and updates in the form of bulletins and newsletters which are distributed to health care providers. The Medicare Provider Manuals, bulletins, and newsletters contain the laws, rules, and regulations pertaining to Medicare-covered services including those rules and regulations regarding the requirements pertaining to providing and billing for home health care.

## HOME HEALTH SERVICES

6. Homebound status is defined in the Medicare Benefit Policy Manual Chapter 7 Section 30.1.1, which states,

> In order for a patient to be eligible to receive covered home health services under both Part A and Part B, the law requires that a physician certify in all cases that the patient be confined to his/her home. An individual does not have to be bedridden to be considered confined to the home. However, the condition of these patients should be such that there exists a normal inability to leave home and, consequently, leaving home would require a considerable and taxing effort. Generally speaking, a patient will be considered to be homebound if they have a condition due to an illness or injury that restricts their ability to leave their place of residence except with the aid of supportive devices such as crutches, canes, wheelchairs, and walkers; the use of special transportation; or the assistance of another person; or if leaving home is medically contraindicated.

7. Medicare Part A and Part B only pay for home health services if a physician certifies that the patient is confined to the home. 42 C.F.R. § 424.22; Medicare

Benefit Policy Manual, Chapter 7, § 30.1.1. Title 42, Code of Federal Regulations, Section 424.22(a)(1) and (2) states in part that:

> As a condition for payment of home health services under Medicare Part A or Medicare Part B, a physician must certify as follows:
>
> (i) The individual needs or needed intermittent skilled nursing care, or physical or speech therapy....-If a patient's underlying condition or complication requires a registered nurse to ensure that essential non-skilled care is achieving its purpose, and necessitates a registered nurse be involved in the development, management, and evaluation of a patient's care plan, the physician will include a brief narrative describing the clinical justification of this need. If the narrative is part of the certification or re-certification form, then the narrative must be located immediately prior to the physician's signature. If the narrative exists as an addendum to the certification or recertification form, in addition to the physician's signature on the certification or recertification form, the physician must sign immediately following the narrative in the addendum.
>
> (ii) Home health services were required because the individual was confined to the home except when receiving outpatient services.
>
> (iii) A plan for furnishing the services has been established and is periodically reviewed by a physician who is a doctor of medicine, osteopathy, or podiatric medicine, and who is not precluded from performing this function under paragraph (d) of this section. (A doctor of podiatric medicine may perform only plan of treatment functions that are consistent with the functions he or she is authorized to perform under State law.)

> (iv) The services were furnished while the individual was under the care of a physician who is a doctor of medicine, osteopathy, or podiatric medicine.
>
> (v) The physician responsible for performing the initial certification must document that the face-to-face patient encounter, which is related to the primary reason the patient requires home health services, has occurred no more than 90 days prior to the home health start of care date or within 30 days of the start of the home health care by including the date of the encounter, and including an explanation of why the clinical findings of such encounter support that the patient is homebound and in need of either intermittent skilled nursing services or therapy services....
>
> (2) Timing and signature. The certification of need for home health services must be obtained at the time the plan of care is established or as soon thereafter as possible and must be signed and dated by the physician who establishes the plan.

Section 424.22(b) states "Recertification is required at least every 60 days, preferably at the time the plan is reviewed, and must be signed and dated by the physician who reviews the plan of care," also known as Form CMS-485, (485 Form). Section 424.22(b)(2) provides that a "recertification statement must indicate the continuing need for services and estimate how much longer the services will be required...."

8. The State of Texas contracts with Texas Medicaid & Healthcare Partnership (TMHP) to process and pay claims submitted by health care providers.

9. In the Medicare application, the provider, in this case Sambritt LLC (Sambritt), agreed to submit claims that were accurate, complete and truthful, including but not limited to, claims for services that are medically necessary.

10. Further, the provider, in this case Sambritt, also agreed to retain all original source documentation and medical records for five years.

11. In order to bill Medicare, one must be an enrolled provider.

### B. THE DEFENDANT

12. NATALIE MARTINEZ, defendant herein, is a former biller for Sambritt.

### C. THE CONSPIRACY

13. Beginning in or about July of 2011, the exact date being unknown, and continuing thereafter to in or about November of 2012, in the McAllen Division of the Southern District of Texas and elsewhere, defendant

### NATALIE MARTINEZ,

did knowingly, and willfully combine, conspire, confederate and agree with other persons known and unknown, to commit offenses against the United States, namely:

> violate the health care fraud statute, that is, to knowingly and willfully execute and attempt to execute, a scheme or artifice: (1) to defraud a health care benefit program, namely the Medicare program; and (2) to obtain, by means of material false and fraudulent pretenses,

representations, and promises, money and property owned by and under the custody and control of, a health care benefit program, namely Medicare, in connection with the delivery of and payment for health care benefits, items and services, namely home health care.

In violation of Title 18 United States Code, Section 1347.

## OBJECT OF THE CONSPIRACY

14. It was the object of the conspiracy for the conspirators to unlawfully enrich themselves and/or others known and unknown, by routinely billing Medicare for home health care services for beneficiaries when:

    a.    physicians' signatures had been forged on 485 Forms,

    b.    485 Forms had not been signed by physicians,

    c.    referrals or signatures on 485 Forms were the product of illegal kickbacks,

    d.    the home health care services were not medically necessary,

    e.    home health care services were not performed or were under-performed by Sambritt's nurses,

    f.    beneficiaries' medical conditions were misrepresented to justify a higher billed amount to Medicare, and

    g.    medical directors signed 485 Forms without actually seeing the beneficiary.

## MANNER AND MEANS

15. The manner and means of the conspiracy include, but were not limited to, the following:

16. Sambritt's owners Y.C., S.C., and M.C., did co-own a home health care company identified as Sambritt.

17. Sambritt's owners did submit enrollment applications to Medicare under the name Sambritt Home Health, LLC, for the submission of claims for payment to Medicare.

18. Sambritt's owners Y.C., S.C., and M.C., did hire DEFENDANT MARTINEZ and assigned her billing duties, which included submitting false claims to Medicare on behalf of Sambritt.

19. Sambritt's owners Y.C., S.C., and M.C. did hire M.F. knowing, or having reason to know, that, prior to working at Sambritt, M.F. routinely forged doctors' signatures while working at other home health care agencies in the Rio Grande Valley.

20. Un-indicted co-conspirators, aiding and abetting each other, would and did routinely cause Medicare to be billed for home health care services for Medicare beneficiaries, knowing that the services had not been performed.

21. Un-indicted co-conspirators, aiding and abetting each other, would and did routinely cause Medicare to be billed for home health care services for Medicare beneficiaries, knowing that the services were not medically necessary.

22. Un-indicted co-conspirators, aiding and abetting each other, would and did routinely cause Medicare to be billed for home health care services for Medicare beneficiaries, knowing that physicians' signatures were forged on 485 Forms and home health care referrals.

23. Sambritt's owners Y.C., S.C., and M.C., would and did receive remittance notices from Medicare reflecting that home health care services were routinely being billed and paid for under their provider number.

24. Sambritt's owners Y.C., S.C., and M.C., would and did send their employees to doctors' offices to induce office staff to refer patients to Sambritt by giving unlawful kickbacks, specifically, lunch, gifts, and gift cards, in an attempt to solicit patients who were over 65 years of age for purposes of providing home health care services regardless of whether the Medicare beneficiary needed home health care services.

25. Sambritt's owners Y.C., S.C., and M.C. would and did routinely cause to be submitted to Medicare, 485 Forms which misrepresented patient conditions in order to meet Medicare coverage requirements, knowing that the conditions did not exist.

26. Sambritt would and did receive payments from Medicare via electronic fund transfers to Frost Bank account No. xxxxx2556 and Capital One NA account No. xxxxx0949.

27. Sambritt's owners Y.C., S.C., and M.C., acting with others both known and unknown, would and did submit and cause to be submitted approximately $5,136,730.00 in claims to Medicare between 2010 and 2013 for home health care services and received approximately $3,804,501.00 as payment for these claims.

28. Sambritt's owners Y.C. and S.C., would and did hire physicians who acted as "medical directors" at Sambritt for the purpose of steering business to Sambritt.

29. DEFENDANT MARTINEZ and other un-indicted co-conspirators both known and unknown, used proceeds of the Medicare fraud to pay unlawful kickbacks, pay other operating expenses, and enrich themselves.

30. Un-indicted co-conspirators would and did pay patients unlawful kickbacks to leave one home healthcare agency to switch to Sambritt.

31. Un-indicted co-conspirators would and did forge doctors' signatures on 485 Forms.

## OVERT ACTS

32. In furtherance of the conspiracy, and to effect the objects thereof, the defendant aided and abetted by others known and unknown, performed and caused to be performed, among others, the overt acts set forth herein and then re-alleged

and incorporated in Count Two of this Information, in the Southern District of Texas, and elsewhere,

33. On or about March 25, 2010, Medicare issued NPI number xxxxxx4297 to Sambritt, LLC.

34. From in or about February 2011 through in or about March 2011, M.C. asked S.L. to create "ghost notes" for patient files.

35. In or about January 2012, DEFENDANT MARTINEZ, at M.C.'s direction billed Medicare for home healthcare services, although the 485 Forms were missing physicians' signatures.

36. Sometime in 2012, M.C. told S.L. that he would pay her $400 per patient for referrals to Sambritt for home health services.

37. From in or about April 2012 through in or about June 2012, M.F. submitted a home health referral form to Sambritt scheduler D.M. with a physician's signature that did not match the physician's actual signature.

38. In or about March 2012, M.F. approached DEFENDANT MARTINEZ with multiple 485 Forms and stated that, "these referrals are only for my daughter."

39. In or about November 2012, M.C. threatened to fire Sambritt marketers, C.G. and E.C. because they asked for too much money to purchase gift cards to recruit patients to Sambritt.

40. In or about late December 2012, un-indicted co-conspirators S.C. and J.H. went to Dr. J.S.'s office, where DEFENDANT MARTINEZ was working, looking for signed 485 Forms that S.C. was waiting for the doctor to sign although the doctor refused to sign them.

41. In or about late December 2012, un-indicted co-conspirators S.C. called DEFENDANT MARTINEZ and asked her to do "him a favor" and "get the 485s signed."

42. In or about January 2013, S.C. and J.V. asked S.L. to mark incorrect and/or incomplete patient quality assurance notes as complete although they were not complete and/or were incorrect.

43. In or about January 2013, J.V. instructed S.C. to take any unsigned 485 Forms that primary care providers refused to sign to Sambritt's medical director.

44. On or about May 8, 2013, Sambritt co-owner, Y.C. and M.L. provided Dr. E.G. with 485 Forms and requested his signature for patients V.F., A.G.D.G., P.U. and D.G. and they also provided Dr. E.G. with patient referral forms which they requested he sign for A.G.D.G. and D.G.

45. Between April 2012 and June 2012, A.C. observed M.F. drop off home health referral forms to Sambritt scheduler D.M. and DEFENDANT MARTINEZ.

46. On or about June 7, 2013, and continuing through on or about June 13, 2013, the day of DEFENDANT MARTINEZ' testimony before the Grand Jury, M.C.

coached and instructed DEFENDANT MARTINEZ on how to answer questions from federal law enforcement agents and how to answer questions posed in the Grand Jury testimony.

In violation of Title 18, United States Code, Section 1349.

**COUNT TWO**
**(FALSE STATEMENT)**
**18 U.S.C. Section 1001**

47. The Grand Jury re-alleges and incorporates by reference as if fully alleged herein paragraphs 1 – 11, and 14-45, of Count One of this Information.

48. On or about May 21, 2013, in the Southern District of Texas, defendant

**NATALIE MARTINEZ,**

did willfully and knowingly make and cause to be made a materially false, fictitious, and fraudulent statement and representation in a matter within the jurisdiction of a department or agency of the United States by telling FBI agents that, while working at Sambritt, she never billed any patient files without a physician's signature. The statements and representations were false because Natalie Martinez knew at the time of the interview, that while she was employed at Sambritt, she did in fact bill Medicare without the physicians' signature present.

In violation of Title 18 United States Code, Section 1001.

## Money Judgment

Defendant is notified that, in the event of conviction, a money judgment may be imposed equal to the total value of the property subject to forfeiture.

## Substitute Assets

Defendant is notified that in the event that property subject to forfeiture, as a result of any act or omission of the Defendant,

(A) cannot be located upon the exercise of due diligence;

(B) has been transferred or sold to, or deposited with, a third party;

(C) has been placed beyond the jurisdiction of the court;

(D) has been substantially diminished in value; or

(E) has been commingled with other property that cannot be divided without difficulty,

the United States will seek to forfeit any other property of the Defendant up to the total value of the property subject to forfeiture, pursuant to Title 21, United States Code, Section 853(p) as incorporated by reference in Title 18, United States Code, Section 982(b)(1).

KENNETH MAGIDSON
UNITED STATES ATTORNEY

BY: _____
Kebharu H. Smith
Assistant United States Attorney